**OFFICE OF THE FEDERAL PUBLIC DEFENDER**
**DISTRICT OF MARYLAND**
NORTHERN DIVISION
TOWER II, 9th FLOOR
100 SOUTH CHARLES STREET
BALTIMORE, MARYLAND 21201-2705
TEL: (410) 962-3962
FAX: (410) 962-0872

JAMES WYDA                                                                NICHOLAS J. VITEK
FEDERAL PUBLIC DEFENDER                            ASSISTANT FEDERAL PUBLIC DEFENDER

March 26, 2017

The Honorable Marvin J. Garbis
United States District Court Judge
District of Maryland
101 W. Lombard Street
Baltimore, MD 21201

Re:  United States v. Joseph Goldman
     MJG 17-0009

Dear Judge Garbis,

Please accept this letter as a motion for Mr. Goldman's release from his re-arraignment until he is sentenced and/or he is required to report to the Bureau of Prisons. As the Court is aware, this Court detained Mr. Goldman on January 6, 2017 finding that he was a flight risk. See Transcript of Hearing January 6, 2017 (hereinafter "hearing"), page 101. The Court also stated that it understood that the case was still being fleshed out and that the Court was open to a further hearing regarding Mr. Goldman's continued detention. Id. At 103-4. Undersigned counsel has discussed this request with both the United States and Pretrial, and they both represent that they continue opposing Mr. Goldman's release.

Mr. Goldman requests that you release him into the custody of his mother under 24/7 home electronic monitoring. His mother has indicated that she would act as a third party custodian, and has been interviewed by Pretrial. Mr. Goldman's wife and children have moved to New York. Mr. Goldman was fired from his previous employment, and thus we would not be seeking his release out of 24/7 home electronic monitoring except for visits with his legal counsel, medical appointments as necessary, and the ability to attend religious services. Based on what undersigned counsel has determined about Mr. Goldman's background, undersigned counsel believes that these conditions will satisfy the Court's concern about Mr. Goldman's risk of flight.

First, it is important to recognize that if the Court were to release him, Mr. Goldman will be a convicted felon. Normally that would be a factor that would weigh against the defendant, but not in this case. Pursuant to the plea agreement that Mr. Goldman has signed, the the government will request a sentence of 18 months.[1] Moreover, the agreement is a C plea that (if accepted) binds this court to a sentence of no greater than two years. However, the maximum penalty is ten years. The plea agreement states that if Mr. Goldman were to engage in "unlawful behavior" prior to his sentencing, the government and the Court could give Mr. Goldman the maximum penalty. Stated plainly, the heaviest of hammers is over Mr. Goldman's head, in that if he were to violate any pretrial conditions he would be exposing himself to a sentence that is 500% greater than the maxium sentence he has agreed to. Moreover, he has no reason to flee, since he has already accepted responsibility for his actions and only now seeks to demonstrate to the Court that a sentence of probation is the appropriate sentence. In short, he is seeking an opportunity to show the Court that he is the man who he has lived his life to be, and that he is worthy of this Court's mercy at his sentencing.

As will be discussed in greater detail at Mr. Goldman's sentencing, Mr. Goldman is a man who deserves release. He has spent the majority of his adult life in service to the United States. Undersigned counsel has records that demonstrate that Mr. Goldman joined the United States military when he was eighteen years old and has remained in one form of other in the United States military until he was placed on Inactive Reserve duty in 2013.[2] Counsel has spoken with two military veterans who served with and alongside Mr. Goldman, one who is currently with the United States Marshals Service and the other who is a Police Officer in the Columbus, Ohio area. Both describe working with Mr. Goldman in the Army Military Police and both describe Mr. Goldman as a hardworking member of their unit whom they looked up to. In addition, records that counsel has obtained demonstrate that he has served our nation abroad in Iraq and was in combat while serving there. Moreover, counsel has records that demonstrate that Mr. Goldman received a security clearance that permitted him to review materials marked "SECRET." These records demonstrate that Mr. Goldman's background, which includes service to our country and placing his life in harm's way, is not one that warrants his continued detention.

Undersigned counsel did not represent Mr. Goldman at his detention hearings. However, counsel has reviewed a transcript of the hearing before this Court on January 6, 2017. In review of that transcript, counsel understood part of the basis for Mr. Goldman's

---

[1] This is below the recommended guidelines of 24-30 months.
[2] Counsel is aware that part of the argument for detaining Mr. Goldman was that there was information that suggests he might have an other than honorable discharge from the National Guard. Undersigned counsel has a record showing that Mr. Goldman was placed on the Inactive National Guard as of April 26, 2013. Counsel has requested Mr. Goldman's military records but to date has not received them. However, according to Army Regulation 135-178 (which describes discharging an individual from that National Guard for failing to show up for training), such a discharge can only be given once there is a hearing before a Board. Absent such a hearing, there can be no discharge for other than honorable. As such, although the records may in fact show an other than honorable discharge, it counsel's belief that this record is error.

detention were based on his statements as to his wealth and employment. If released, Mr. Goldman will not seek employment pending sentencing. The signed affidavit by Mr. Goldman and filed in this court on January 18, 2017 describes no meaningful assets or wealth. Mr. Goldman has been appointed counsel and thus there are no deep resources or assets upon which Mr. Goldman can draw upon if released – a concern of the Court.

With respect to his statements as to the value of his patents, undersigned counsel has been able to establish that these are in fact valid patents and may, at some future date, warrant a significant return. Undersigned counsel has a record from the United States patent office which shows that Patent 9,334,047 was granted to Mr. Goldman and others for a "method and system for the powered self-push back of an aircraft." On first examination, this appears nothing more than a speculative patent. However, in researching the patent, counsel discovered that the patent is the basis for a Wheeltug, a company that is owned by Borealis Exploration Limited,[3] a company that trades on the Over The Counter (OTC) marketplace. Wheeltug is a a method for pushing back airplanes without the need of a vehicle to push and taxi the vehicle called "e-taxi." This is exactly what is described in Mr. Goldman's patent. According to AviationWeek, Wheeltug was recently granted FAA certification to begin testing on Boeing 737 airplanes and hopes to be in service by late 2018. http://aviationweek.com/technology/wheeltug-begins -e-taxi-certification-and-promises-pushback-savings. According to a press release on the KLM website, the large carrier has agreed to test Wheeltug for use on its jets. https://klmtakescare.com/en/content/electric-taxiing -economical-and-quiet-. Moreover, it appears that numerous other airlines are in talks, including Alitalia, Israir, Iceland Air, and El Al Airlines. In short, the Mr. Goldman's patent and Wheeltug's commercial operations are both very real – having been granted permission by the FAA to test and the interest of numerous very large commercial carriers.

Will these patents be worth the amount that Mr. Goldman hopes? Only time will tell. What is clear is that these are valid patents with valid business backing and the return on these patents have the potential to save airlines substantial sums. According to Wheeltug, each minute of delay can be as high as $159 to the airline and that the use of their system will save a minimum of 7 minutes. Doing the math, this means that their system could save over a thousand dollars *per* flight. According to the FAA, there were over 8.7 million flights in the United States last year alone. Using these basic numbers, that is almost $9 *billion* of saved time per year for just the United States. Using these calculations, the amounts cited by Mr. Goldman no longer appear to be mere hyperbole. 1% of that annual savings is $90 million, and that is just for a single year of flights in the United States. Moreover, undersigned counsel has been able to establish through FAA records that Mr. Goldman is a licensed pilot. He is currently not actively working as a

---

[3] Borealis is a company that has been in business for several decades. Although it is registered in Gibraltar, it has no physical presence in that country. The top key executive for the company found at finance.yahoo.com who is also listed on the patent with Mr. Goldman is a resident of Maryland. The contact number for Wheeltug is a Maryland number.

pilot, and will not be working as a pilot if released, but given the fact that he is a commercial pilot, his interest in the patent and the company Wheeltug appears less fanciful that first appeared to the Court.

Another basis to release Mr. Goldman is that he is being held in very difficult and dangerous conditions. The Chesapeake Detention Facility is one of the most secure prisons in the United States. Undersigned counsel recently completed a tour of the facility, and the area of movement for Mr. Goldman is limited to his 9 x 4 cell and a small table outside his cell. He is housed with some of the most dangerous individuals that the United States government prosecutes. Alone, this would be no basis for Mr. Goldman's release. However, Mr. Goldman is guilty of committing a tax offense for failing to register three firearms. The guidelines for this offense recommend a short sentence that will likely be served at a Bureau of Prisons facility that is equal to a minimum or low security classification – not a facility that is built to house the worst offenders in the United States. Most offenders who find themselves facing similar sentences for similar conduct are released pending sentence and permitted to self-surrender.

During the hearing it appeared the Court was under the impression that Mr. Goldman should not, and in fact could not, own these firearms. That, however, is not correct. As counsel is learning, it appears to be very common for ex-military individuals to own the types of firearms they were trained to use while in the military. According to the ATF, there are over 10,000 permits to make and own these types of firearms. In fact, these numbers may be greater than 10,000 as often many of these arms are owned by a "trust" which allows multiple individuals to use the regulated firearms, but is considered only one entity for ATF purposes. Undersigned counsel has interviewed at least one former military officer who owns these types of regulated firearms, including a short barrel AR-15 like Mr. Goldman. Moreover, counsel has found numerous websites that sell either these weapons in complete form, or the basic components to build them – often for less than $100. Although this culture is foreign to undersigned counsel, and perhaps the Court, it is clear that there is a very large and robust community of people interested in owning these firearms and that there are many who do so lawfully.

Moreover, if Mr. Goldman had completed the proper form at the proper time, there would be no basis to deny Mr. Goldman the right to own these firearms. Until now, he was not a convicted felon and with his police and military experience, he was exactly the type of person who has the requisite training and expertise to own these weapons. As is clear from Mr. Goldman's patents, he is a tinkerer at heart. Although the government represented that Mr. Goldman made these firearms because they are "cool" the correct statement is that Mr. Goldman was interested in making these firearms because the *science* of it was cool. See Statement of Joseph Goldman to ATF Agent on December 30, 2016 at 15:37. Mr. Goldman had become disabled and was no longer able to fly as a pilot, and thus his hobby was to tinker with the weapons he used while in the military. What is absolutely clear and is repeated not only by Mr. Goldman in his statements to the police,

but also to those who he knows and spoke with, Mr. Goldman *thought* he was manufacturing these firearms in the correct and legal way. He was wrong – and for that mistake he will forever be a convicted felon and thus forever banned from using the very firearms that were his main hobby. But it is not as if he was a madman hoarding weapons that he was banned from owning. He is an ex-military former police officer who was trained in the use of these weapons, could have legally owned these weapons, and but for the belief that he could manufacture these weapons first and then obtain approval, would in fact now own these weapons legally. Counsel has interviewed a law enforcement officer who owns his own regulated firearms, and who states that he advised Mr. Goldman as to how to manufacture the weapons legally. He states that it is legal for an individual to assemble these weapons before registration as long as they are not used. It is unclear what this individual meant by "used" but it is clear that this is legally wrong. However, it does underscore that Mr. Goldman genuinely believed that what he was doing was in fact legal and proper.

Lastly, Mr. Goldman's time at the Chesapeake Detention Facility has been incredibly difficult. Mr. Goldman is Jewish, and requires Kosher meals and time for his prayers. However, counsel has records from CDF that show that Mr. Goldman has not been receiving Kosher meals. The facility reports that in order to receive Mr. Goldman's meals, they are first made in Jessup and then transported to Baltimore where they are eventually brought to Mr. Goldman. The facility in fact has shared on at least one occasion his frustration in not receiving the meals, but notes that they cannot provide him a meal unless it is first provided from the Jessup facility. This means that Mr. Goldman often does not receive his meals until late in the evening. Moreover, on numerous occasions Mr. Goldman has been deprived his right to pray. Given that Mr. Goldman's religious liberty is being restricted, and given that his offense and characteristics do not require his detention in one of the most secure facilities in the United States, his continued detention at the Chesapeake Detention Facility is a violation of his religious liberty.


## **CONCLUSION**

Mr. Goldman is seeking an opportunity to show the Court that he is the type of man deserving this Court's leniency. His continued detention will serve no purpose other than to punish Mr. Goldman. However, even here, the punishment will be greater than any sentence this Court imposes. This is because if Mr. Goldman were to be sentenced to imprisonment he would not be held at one of the securest faculties in the Bureau of Prisons but likely a low or even minimal security facility. This is because the BOP understands that the crime Mr. Goldman committed and his individual background does not compel the harshest of punishments. Moreover, by denying him release, this Court may force Mr. Goldman into a more secure facility than he otherwise might be placed because he will not

receive the reductions in his security classification points that are awarded someone who is permitted to self-surrender.

      For this, and all the reasons stated above, Mr. Goldman requests that you release him on home detention with 24/7 home electronic monitoring. Such conditions are very secure, but recognize Mr. Goldman's background and the likely sentence he will receive. If Mr. Goldman were to violate these conditions, he would only place himself at risk of receiving a sentence that is multitudes higher than what he stands to receive now. Thus, Mr. Goldman has the greatest incentive to abide by this Court and seeks only the opportunity to show the Court the man he truly is.

_____/s/_____
Nicholas J. Vitek